UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MASEFIELD AG and MASEFIELD LTD.,

          Plaintiffs,

  - against -

COLONIAL OIL INDUSTRIES, INC.,

          Defendant.

**OPINION AND ORDER**

05 Civ. 2231 (PKL)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/18/05

**APPEARANCES**

STANLEY MCDERMOTT III, ESQ.
DLA Piper Rudnick Gray Cary US LLP
1251 Avenue of the Americas
New York, New York 10020-1104

Attorneys for Plaintiffs


FELIX WEINACHT, ESQ.
White & Case LLP
1155 Avenue of the Americas
New York, New York 10036

Attorneys for Defendant

**LEISURE, <u>District Judge</u>:**

In this action, plaintiffs, Masefield AG and Masefield Ltd., seek injunctive relief enjoining defendant from pursuing arbitration against them before the International Chamber of Commerce ("ICC"). Plaintiffs also request judgment declaring that they have no agreement to arbitrate with defendant and are not bound to arbitrate with defendant. Plaintiffs now petition the Court for a preliminary injunction barring defendant from arguing before the three-member Arbitration Tribunal (the "Tribunal"), to be formed by the ICC, that the Tribunal has the power to determine whether plaintiffs must arbitrate defendant's demands. After filing their written submissions, the parties appeared before the Court for oral argument on April 12, 2005. For the reasons that follow, plaintiffs' request for a preliminary injunction is GRANTED.

## BACKGROUND

According to the complaint, on September 23, 2003, defendant, a large independent oil distributor, entered into a purchase agreement (the "Contract") with Masefield America ("MA"), a company affiliated with plaintiffs. (See Complaint ("Compl.") ¶ 13.) The Contract provided that MA would sell approximately 50,000 tons of fuel oil to defendant each month of the one-year period beginning November 1, 2003 through October 31, 2004. (<u>Id.</u>) The Contract also contained an arbitration provision, which stated in pertinent part:

> Unless otherwise agreed between the parties in writing any disputes between them shall be resolved by Arbitration in City of New York, United States of America, under the rules of Conciliation and Arbitration of the International Chamber of Commerce, each party appointing its own Arbitrator with a third being appointed by the two so chosen.

(<u>Id.</u> ¶ 14.)

On October 29, 2004, defendant filed a demand for arbitration (the "Arbitration Demand") with the ICC, alleging that MA, along with plaintiffs, defaulted on the Contract by failing to deliver fuel oil during the months of September and October 2004. (Id. ¶ 13.) Defendant claimed that this breach caused it to sustain damages of $3,644,520. (Id.)

Plaintiffs' action was triggered by defendant's decision to name plaintiffs, along with MA, as parties in the Arbitration Demand, even though plaintiffs are not signatories to the Contract. (Id. ¶ 2.) The complaint states that, though affiliated with plaintiffs, MA is a separate and independent company, and neither Masefield AG nor Masefield Ltd. is a parent or a subsidiary of MA.[1] (Id. ¶ 3.) Thus, while MA filed a response to the Arbitration Demand, denying that it breached the Contract, (id. ¶ 13), plaintiffs, in several submissions to the ICC, argued that they were not parties to any arbitration agreement with defendant, should not be included as respondents in this arbitration, and are not subject to ICC jurisdiction, (id. ¶ 17).

On January 31, 2005, the ICC informed plaintiffs that it was referring the threshold issue of arbitrability to the Tribunal. (Id. ¶18.) As a result, plaintiffs filed the instant action on February 17, 2005, seeking (1) injunctive relief barring defendant from pursuing any arbitration against them, and (2) a declaratory judgment that they have no agreement to arbitrate with defendant and are not bound to arbitrate with defendant. On March 8, 2005, the Court endorsed plaintiffs' application for an order to show cause why the preliminary injunction and the declaratory judgment should not be granted, and, as noted above, the parties appeared before the Court for oral argument on April 12, 2005.

---

[1] A declaration filed with plaintiffs' papers explains the relationship between MA and plaintiffs more fully. James Daley owns 90% of Masefield AG, which is the parent company of Masefield Ltd. Daley is the sole owner of Masefield Trading AG, which is a non-party affiliate company and the parent company of MA. Therefore, plaintiffs are affiliated companies of MA, but not in the same ownership chain. (See Declaration of James Daley, dated March 1, 2005, ¶ 5-6.)

3

## DISCUSSION

### I. Arbitrability To Be Determined by the Court

As a preliminary matter, the parties dispute whether the Court or the Tribunal should decide whether plaintiffs have agreed to arbitrate with defendant. Both sides primarily rely upon First Options of Chicago, Inc. v. Kaplan, wherein the Supreme Court ruled that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." 514 U.S. 938, 944 (1995) (quoting At&T Tech., Inc. v. Communications Workers, 475 U.S. 643, 651 (1986)); see also Abram Landau Real Estate v. Benova, 123 F.3d 69, 72 (2d Cir. 1997) ("When parties disagree about whether they ever entered into an arbitration agreement, a court decides that issue, absent a clear and unmistakable delegation of that authority to an arbitrator.") (citations omitted). Plaintiffs argue that the Court should decide this issue because they have not entered into any contract with defendant containing an arbitration provision, much less demonstrated any intention to give the Tribunal the power to determine whether they agreed to arbitrate with defendant. (See Plaintiffs' Memorandum Of Law In Support Of Their Application For An Order To Show Cause Why This Court Should Not Prohibit Colonial Oil Industries, Inc. From Asserting Its Right To Arbitrate Against Plaintiffs ("Pls. Mem.") at 5.) Defendant, on the other hand, contends that the Tribunal, not the Court, should determine the issue of arbitrability because the Contract's broad arbitration provision constitutes "clear and unmistakable evidence" of the parties' intentions to refer this decision to the arbitrators. (See Defendant's Response to Order to Show Cause ("Def. Mem.") at 3.)

In First Options, the Supreme Court directs lower courts to apply "ordinary state-law principles that govern the formation of contracts" when determining whether the parties agreed

to arbitrate a particular issue, including arbitrability. See First Options, 514 U.S. at 944 (citations omitted). Under New York law, which applies here pursuant to paragraph 19 of the Contract, it is axiomatic that the formation of a contract requires 1) offer, 2) acceptance, and 3) consideration. See Deutsche Asset Mgmt. v. Callaghan, No. 01 Civ. 4426, 2004 U.S. Dist. LEXIS 5945, *47 (S.D.N.Y. Apr. 7, 2004) (Motley, J.) (citations omitted). Moreover, the intent of the parties assumes "central importance" when determining whether a contract was formed. Id. (citations omitted).

Here, defendant simply presumes that plaintiffs are parties to the Contract before arguing that the broad arbitration provision contained within it manifests plaintiffs' intent to submit the issue of arbitrability to the Tribunal. Defendant has not attempted to explain why the Contract agreed to by MA and defendant should be considered probative of plaintiffs' intent to agree with defendant. Furthermore, defendant does not challenge plaintiffs' assertion that they played no role in negotiating the terms of the Contract with defendant. (See Declaration of Kenhardt Scheepers ("Scheepers Decl."), dated March 1, 2005, ¶¶ 5-6.) Thus, on the present record, the Court is unwilling to interpret the Contract as anything more than a manifestation of the intentions of MA and defendant, and rejects defendant's contention that the arbitration provision clearly and unmistakably reveals plaintiffs' desire to arbitrate arbitrability with defendant. Because defendant relies solely on the breadth of the Contract's arbitration provision[2] and does not direct the Court to any clear and unmistakable evidence that plaintiffs agreed with defendant on any issue, much less the issue of arbitration, the Court will decide whether plaintiffs are bound to arbitrate with defendant. See First Options, 514 U.S. at 944.

---

[2] Defendant also argues that the broad arbitration provision incorporates the ICC Rules, including Article 6(2), which expressly grants the Tribunal the responsibility of determining questions pertaining to its jurisdiction. (See Def. Mem. at 7-9.) However, this assertion is also founded upon the unproven assumption that the arbitration provision reflects plaintiffs' intent.

5

## II. The Arbitration Provision May Not Be Enforced Against Plaintiffs

As this Court has stated in the past, "[i]t is fundamental that arbitration agreements are creatures of contract law." Scher v. Bear Stearns & Co., 723 F. Supp. 211, 214 (S.D.N.Y. 1989) (Leisure, J.) (citation omitted). Thus, "'a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit.'" Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)). "Absent an express agreement to arbitrate, [the Second Circuit] has recognized only 'limited theories upon which [it] is willing to enforce an arbitration agreement against a non-signatory.'" Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003) (quoting Thomson, 64 F.3d at 780). The five recognized theories are: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." Id. at 129 (quoting Thomson, 64 F.3d at 776). Defendant maintains that three of the five theories apply to plaintiffs in this case. Specifically, defendant asserts that plaintiffs are bound to arbitrate, even though they are not signatories to the Contract, because (1) plaintiffs' participation in the performance of the Contract amounts to estoppel; (2) plaintiffs were MA's agents; and (3) MA is no more than plaintiffs' alter ego. (See Def. Mem. at 5.) The Court will address each argument *in seriatim*.

### A. Estoppel

Guided by ordinary principles of contract and agency, the Second Circuit has reasoned that a non-signatory may be bound by an agreement containing an arbitration provision where the non-signatory knowingly exploited and accepted the benefits of an agreement.[3] See MAG

---

[3] The courts of this Circuit have also developed an "alternative estoppel theory," which provides that a signatory will be estopped from avoiding arbitration with a non-signatory when "'the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement

6

Portfolio, 268 F.3d at 61 (quoting Thomson, 64 F.3d at 778, and citing Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993)). The Circuit has emphasized that "[t]he benefits must be direct – which is to say, flowing directly from the agreement." Id. (citing Thomson, 64 F.3d at 779). In Am. Bureau of Shipping v. Tencara Shipyard, S.P.A., 170 F.3d 349, 353 (2d Cir. 1999), for example, non-signatory owners of a vessel were found to directly benefit from an agreement containing an arbitration provision between a shipyard and a classification society, where the classification of the vessel enabled the owners to secure insurance at lower rates and sail the vessel under a certain country's flag. Similarly, a non-signatory to an agreement, which governed the use of a trade name and contained an arbitration clause, was estopped from arguing that it was not bound to arbitrate after it had received a copy of the agreement, did not object to it when given the opportunity to do so, and utilized the trade name pursuant to the terms of the agreement. See Deloitte, 9 F.3d at 1064.

Conversely, where "the agreement [is] not the direct source of the benefit," a non-signatory is not bound to arbitrate. Thomson, 64 F.3d at 778-79. In Thomson, two companies entered into an exclusive trade agreement. Id. at 775. Subsequently, a third party competitor acquired one of the companies in an apparent attempt to force the remaining company out of the market. Id. The unacquired signatory was now bound to trade only with a company that was a subsidiary of its competitor and the level of trading declined. Id. The Court ruled that the non-signatory was not subject to arbitration because the benefit derived by the non-signatory flowed from its acquisition of one of the signatories, not directly from the agreement itself. Id. at 779.

---

that the estopped party has signed,' and the signatory and non-signatory parties share a close relationship." MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 62 (2d Cir. 2001) (quoting Thomson, 64 F.3d at 779). This theory does not apply to cases like the present one where a signatory is attempting to bind a non-signatory.

7

Defendant contends that Masefield AG is estopped from avoiding arbitration because its receipt of all of the proceeds from the eight cargoes of fuel oil purchased by defendant constituted a direct benefit flowing from the Contract. (See Def. Mem. at 5.) Plaintiffs concede that Masefield AG assisted MA in directing defendant to make its payments under the Contract directly to Masefield AG for a debt owed by MA to Masefield AG. (See Scheepers Decl. ¶ 9). However, plaintiffs argue, *inter alia*, that the proceeds are an indirect benefit, and therefore insufficient for estoppel purposes, because Masefield AG only exploited the contractual relationship between MA and defendant, and not the Contract itself. (See Plaintiffs' Memorandum Of Law In Response To Defendant's Response To Order To Show Cause And Defendant's Motion To Dismiss The Complaint ("Pls. Reply") at 6 (citing MAG Portfolio, 268 F.3d at 61).)

While at first blush the Contract may appear to be the direct source of defendant's payments to Masefield AG, Masefield AG's benefit here actually flows directly from MA's prior debts to Masefield AG. Indeed, the Contract only addresses defendant's purchase of fuel oil from MA and makes no mention of Masefield AG or its receipt of the proceeds. Though Masefield AG may be taking advantage of MA's agreement with defendant to secure repayment of MA's prior obligations, any benefit derived from it is indirect.

Moreover, unlike the non-signatories in Am. Bureau and Deloitte that were estopped from avoiding arbitration, there is no evidence on the present record that Masefield AG specifically contemplated exploiting the terms of the Contract prior to its formation. In Am Bureau, upon which defendant relied at oral argument, the agreement at issue was between a shipyard and a classification society, which inspected vessels and declared them seaworthy. See 170 F.3d at 351. It is evident from the non-signatory vessel owners' earlier agreement with the

shipyard, wherein the parties agreed that the vessel would be inspected by the classification society with whom the shipyard later contracted, that the vessel owners contemplated deriving some benefit from the particular terms of the later agreement. Id. In a similar fashion, when the non-signatory company in Deloitte received the agreement concerning the use of a trade name, chose not to object to it, and then proceeded to use the trade name pursuant to the terms of the agreement, it may be inferred that the non-signatory considered the terms of the agreement and determined that it would later seek to benefit from them. See 9 F.3d at 1064.

By contrast, there has been no showing here that Masefield AG was even aware of MA's agreement with defendant, much less considered its specific terms, when it decided to loan MA the funds, which were repaid, at least in part, with the proceeds from the Contract. It appears to the Court that this case is more analogous to Thomson, than to Am. Bureau or Deloitte. Just as the benefit derived by the non-signatory in Thomson flowed from its position as the parent of one of the signatories, see Thomson, 64 F.3d at 779, Masefield AG's benefit here results from its position as MA's lender, and not from the Contract itself. Furthermore, the Thomson Court explained that the non-signatory would have been estopped from avoiding arbitration if it had attempted to exploit specific provisions of the agreement containing the arbitration provision. See Thomson, 64 F.3d at 779. Likewise, had Masefield sought to invoke or enforce particular aspects of the Contract, it too would be compelled to arbitrate. However, there is no evidence on the present record that it did so. Accordingly, the Court finds that Masefield AG is not estopped from avoiding arbitration with defendant.

B.   **Agency**

In its papers, defendant claims, without more, that plaintiffs should be compelled to arbitrate because they were MA's agents. (See Def. Mem. at 5.) When pressed further on the

issue at oral argument, defense counsel argued that the agency theory should apply to Masefield Ltd. because paragraph 21 of the Contract provides that "[a]ll operational enquiries & other matters arising should be forwarded solely to: Masefield Ltd." In addition, Masefield AG allegedly acted as MA's agent in receiving all of defendant's payments under the Contract.

The Second Circuit has cautioned that "conclusory allegations of a general agency relationship between a signatory and non-signatory do not suffice to compel . . . unwilling non-signatories to arbitrate under that theory." Alco Int'l, E.C. v. Merrill Lynch & Co., 98 Fed. Appx. 44, 46-47 (2d Cir. 2004) (citing Merrill Lynch, 337 F.3d at 130-31). A full showing of agency supported by an accepted theory of agency or contract law is required, and generalized allegations of affiliation are insufficient. See Merrill Lynch, 337 F.3d at 130-31 (citing Thomson, 64 F.3d at 780). "'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" Merrill Lynch, 337 F.3d at 130 (quoting Restatement (Second) of Agency, § 1 (1958)).

In its conclusory argument, defendant fails to establish that plaintiffs, as the alleged agents, acted subject to MA's control with respect to the Contract. While plaintiffs concede that Masefield Ltd. provided MA with some operational support until MA hired an operations manager and that Masefield AG assisted MA in directing defendant to pay Masefield AG directly (see Scheepers Decl. ¶¶ 8-9), these facts do not demonstrate that plaintiffs consented to act at the direction of MA. Accordingly, an agency relationship is not evident at this stage and plaintiffs cannot be compelled to arbitrate under this theory.

C.  **Alter Ego/Veil-Piercing**

In certain circumstances, a court may pierce the corporate veil of one corporation and hold a second corporation legally accountable for the actions of the first if the second corporation (1) exercised complete domination over the first with respect to the transaction at issue, and (2) such domination was used to defraud or injure the party seeking to pierce the veil. See MAG Portfolio, 268 F.3d at 63; Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997). Determining whether one corporation has completely dominated another is a "fact specific" inquiry, in which courts consider many factors, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

MAG Portfolio, 268 F.3d at 63 (quoting Freeman v. Complex Computing Co., 119 F.3d 1044, 1053 (2d Cir. 1997)). Thus, a non-signatory may be bound to arbitrate where it exercised complete domination over a signatory and employed that domination to injure another signatory to the agreement. See, e.g., Thomson, 64 F.3d at 777-78. However, the conduct at issue must reveal "a virtual abandonment of separateness." Id. (citations omitted).

Defendant's veil-piercing argument falls well short of the standard set forth above. Citing Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 97 (2d Cir. 1999), wherein the Court found it significant to the veil-piercing analysis that virtually of the correspondence of various affiliate companies was mailed to the same address and that the affiliates were referred to as a "group" of companies, defendant contends that MA is no more

11

than plaintiffs' alter ego because the Contract directs all inquiries to be sent to Masefield Ltd. and plaintiffs have described themselves, along with MA, as the "Masefield Group" or "Masefield group of companies." (See Def. Mem. at 5-6.) Considering these two relatively minor facts in the context of the unchallenged declarations of Scheepers and Daley, which state that MA, Masefield AG, and Masefield Ltd. are each fully capitalized, independent companies with minimal personnel overlap that deal with one another in an arm's length manner, the Court is not persuaded that either plaintiff completely dominated defendant for the purpose of harming defendant. The present record does not reflect a "virtual abandonment of separateness" and therefore, it would be improper to pierce MA's corporate veil.

### III. A Preliminary Injunction Should Issue

It is well established that in order to obtain a preliminary injunction, the movant must show: (a) irreparable harm; and, (b) either, (1) likelihood of success on the merits; or, (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. See, e.g., Sweeney v. Bane, 996 F.2d 1384, 1388 (2d Cir. 1993); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979). Whether injunctive relief should issue or not "'rests in the sound discretion of the district court which, absent abuse of discretion, will not be disturbed on appeal.'" Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (quoting Thornburgh v. Am. Coll. of Obstetricians and Gynecologists, 476 U.S. 747, 755 (1986)).

Irreparable harm is "'the single most important prerequisite for the issuance of a preliminary injunction.'" Reuters Ltd., 903 F.2d at 907 (quoting Bell & Howell: Mamiya Co. v. Masel Co. Corp., 719 F.2d 42, 45 (2d Cir. 1983)). Irreparable harm is an "injury for which a

monetary award cannot be adequate compensation." Javaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995) (citing Jackson Dairy, 596 F.2d at 72). Further, "[i]rreparable harm must be shown by the moving party to be imminent, not remote or speculative." Reuters, 903 F.2d at 907 (citing Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 972 (2d Cir. 1989)). The movant is required to establish not a mere possibility of irreparable harm, but that it is "*likely* to suffer irreparable harm if equitable relief is denied." JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990). "Likelihood sets, of course, a higher standard than 'possibility.'" Id.

Within the arbitration context, the Second Circuit has held that irreparable harm results from arbitrating a dispute involving a party who is not covered by the arbitration agreement. See Maryland Casualty Co. v. Realty Advisory Bd. on Labor Relations, 107 F.3d 979, 985 (2d Cir. 1997) ("[T]he time and resources [plaintiff] would expend in arbitration is not compensable by any monetary award of attorneys' fees or damages pursuant to the provisions of the [arbitration agreement] or the Arbitration Act."); see also Merrill Lynch, 337 F.3d at 129.

Here, plaintiffs advance the same argument to establish both irreparable harm and a likelihood of success on the merits. They maintain that, because they are not signatories to the Contract and none of the five theories for binding non-signatories properly apply to them, the Contract's arbitration provision may not be enforced against them. Thus, if forced to arbitrate against defendant, they will (1) suffer irreparable harm pursuant to Maryland Casualty, and (2) will likely prevail on the merits of their claim to preclude defendant from arbitrating against them. (See Pls. Mem. at 6.)

Plainly, the force of plaintiffs' argument for preliminary injunctive relief largely depends upon whether the Contract's arbitration provision may be enforced against them. As discussed in Part II supra, on the present record, defendant cannot demonstrate that plaintiffs, as non-

signatories, are bound to arbitrate along with MA. As a result, at this stage, plaintiffs would suffer irreparable harm if compelled to arbitrate with defendant, see Maryland Casualty, 107 F.3d at 985, and, because plaintiffs' claim is limited to preventing defendant from arbitrating with them, there appears to be a likelihood of success on the merits. Moreover, the balance of hardships tips decidedly in plaintiffs' favor here, as defendant should not be permitted to compel two non-signatories to arbitrate under the Contract without a clear basis in the law. Meanwhile, defendant is not left without a remedy as it may continue to pursue its claim in arbitration against MA.

### IV. Rule 65 Requirements

A court issuing a preliminary injunction must be specific and describe in reasonable detail the act or acts sought to be restrained. See Fed. R. Civ. P. 65(d). Thus, during the pendency of this action, the Court hereby enjoins defendant from asserting to the Tribunal in the arbitration proceeding against MA that the Tribunal has the power to determine whether plaintiffs must arbitrate defendant's demands.

In addition, Federal Rule of Civil Procedure 65(c) provides in pertinent part:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c).

"The purpose of requiring security prior to issuance of an injunction or a temporary restraining order is to guarantee payment of costs and damages incurred by a party who is wrongfully enjoined or restrained." Interlink Int'l Fin. Servs., Inc. v. Block, 145 F. Supp. 2d 312, 314 (S.D.N.Y. 2001) (quoting 13 Moore's Federal Practice at 65-94.1 (3d. ed. 1997)).

Generally, the amount of the bond posted is the limit that a wrongfully restrained party may recover. See id. District courts in the Second Circuit are vested with wide discretion in determining the amount of the bond that the moving party must post. See Doctor's Assocs., Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996); Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir. 1961). Indeed, in cases where the non-movant has not shown a likelihood of harm, the district court may properly set no bond. See Doctor's Assocs., 85 F.3d at 985; Ferguson, 228 F.2d at 675.

Though the parties did not address the bond issue in their filings, the Court requested their views at oral argument. Plaintiffs maintained that no bond is necessary because the merits of defendant's Arbitration Demand are not at issue in plaintiffs' request for a preliminary injunction; the sole issue is whether plaintiffs can be compelled to arbitrate. Conversely, defendant argued that, because MA is a shell company and any future judgment against it may not be collectible, the bond amount should equal the amount at stake in the arbitration, namely $3,644,520. Defendant's position assumes that, if it ultimately prevails against MA but cannot collect from MA, it necessarily should be able to arbitrate against plaintiffs. As discussed above, defendant, thus far, has not established that it can arbitrate against plaintiffs for the amount claimed in its Arbitration Demand. If defendant later demonstrates that plaintiffs should be subject to arbitration, then the preliminary injunction may be vacated and defendant would be free to pursue its claims against plaintiffs. Consequently, on the present record, defendant cannot show a likelihood of harm and the Court will not require plaintiffs to post a bond.

# CONCLUSION

For the foregoing reasons, plaintiffs' request for a preliminary injunction is GRANTED.

**SO ORDERED.**

New York, New York
April 18, 2005

_____
U.S.D.J.

Copies of this Opinion and Order have been sent to:

Stanley McDermott III, Esq.
DLA Piper Rudnick Gray Cary US LLP
1251 Avenue of the Americas
New York, New York 10020-1104
Attorneys for Plaintiffs

Felix Weinacht, Esq.
White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attorneys for Defendant