USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/1/05

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MASEFIELD AG and MASEFIELD LTD.,

                Plaintiffs,

- against -

COLONIAL OIL INDUSTRIES,

                Defendant.

**OPINION AND ORDER**

05 Civ. 2231 (PKL)

**APPEARANCES**

STANLEY MCDERMOTT, III, ESQ.
ROBERT F. FINK, ESQ.
DLA Piper Rudnick Gray Cary US LLP
1251 Avenue of the Americas
New York, New York 10020-1104

Attorneys for Plaintiffs


BLAINE H. BORTNICK, ESQ.
LEILA I. NOOR, ESQ.
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, New York 10022

Attorneys for Defendant

**LEISURE, <u>District Judge:</u>**

Plaintiffs, Masefield AG and Masefield Ltd., filed the instant action because they seek to avoid arbitration before the International Chamber of Commerce ("ICC") with defendant, Colonial Oil Industries, Inc. ("Colonial"). They request injunctive relief enjoining Colonial from attempting to arbitrate with them, as well as a declaratory judgment providing that they have no agreement to arbitrate with Colonial and are not bound to arbitrate with Colonial. On April 18, 2005, the Court granted plaintiffs' request for a preliminary injunction, finding that, on the record before the Court, plaintiffs, as non-signatories, cannot be bound to the arbitration agreement between Colonial and non-party Masefield America ("MA"), pursuant to the theories of estoppel, agency, or alter ego. Accordingly, the Court enjoined Colonial from asserting to the ICC Tribunal in the arbitration proceeding against MA that the Tribunal has the power to determine whether plaintiffs must arbitrate Colonial's demands. One week later, on April 25, 2005, the Court denied Colonial's motion to dismiss for failure to state a claim because it was based on the same arguments that the Court considered and rejected in granting plaintiffs' application for a preliminary injunction.

On May 9, 2005, Colonial filed an Answer and Counterclaim, wherein it asks the Court to dismiss the Complaint with prejudice and direct plaintiffs to submit to arbitration, including submission of plaintiffs' claims brought in this action. In response, plaintiffs filed the instant motion seeking to dismiss the counterclaim for failure to state a claim, and to enjoin Colonial permanently from seeking to arbitrate its claims against them. In its opposition, Colonial cross-moved for leave to amend its counterclaim in order to assert claims of tortious interference with contract and tortious interference with prospective business relations against both plaintiffs. The Court will address the parties' competing motions below *in seriatim*.

## BACKGROUND

The facts giving rise to this action are set forth in the Court's prior Orders, with which familiarity is assumed. See Masefield AG v. Colonial Oil Indus., Inc., No. 05 Civ. 2231, 2005 U.S. Dist. LEXIS 7158 (S.D.N.Y. Apr. 25, 2005); Masefield AG v. Colonial Oil Indus., Inc., No. 05 Civ. 2231, 2005 U.S. Dist. LEXIS 6737 (S.D.N.Y. Apr. 18, 2005) ("Masefield I"). In September 2003, MA, a non-party affiliate of plaintiffs,[1] agreed to sell approximately 50,000 tons of fuel oil to defendant Colonial, a large oil distributor, each month for the one year period beginning November 1, 2003. The purchase agreement (the "Contract") contained an arbitration provision, which provided for all disputes between the parties to be resolved under the rules of the ICC by a three-member arbitration panel appointed by the parties. In October 2004, Colonial filed a demand for arbitration with the ICC, alleging that MA and plaintiffs defaulted on the Contract by failing to deliver fuel oil during the final two months of the Contract period. In several submissions to the ICC, plaintiffs maintained that they were not subject to ICC jurisdiction because they were not parties to the Contract or any other arbitration agreement with Colonial. Nonetheless, the ICC decided to refer the threshold issue of arbitrability to the Tribunal. As a result, plaintiffs filed the instant action on February 17, 2005, seeking injunctive and declaratory relief.

---

[1] According to plaintiffs, MA is affiliated with Masefield AG and Masefield Ltd. but not in the same ownership chain. Specifically, James Daley owns 90% of Masefield AG, which is the parent company of Masefield Ltd. In addition, Daley is the sole owner of Masefield Trading AG, which is the parent company of MA. (See Declaration of James Daley ¶¶ 5-6.)

## DISCUSSION

### I.   Rule 12(b)(6) Standard[2]

When determining whether to dismiss a claim on motion for failure to state a claim for which relief may be granted, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (quoting Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000)); see also Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 740 (1976); Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992), cert. denied, 507 U.S. 961, and, 507 U.S. 972 (1993). Similarly, when considering a motion to dismiss a counterclaim for failure to state a claim, the Court must accept the material facts alleged in defendant's answer and counterclaim as true and construe all reasonable inferences in favor of defendant. See Twinlab Corp. v. Signature Media Servs., No. 99 Civ. 169, 1999 U.S. Dist. LEXIS 18973, at *10 (S.D.N.Y. Dec. 6, 1999) (citing, *inter alia*,

---

[2] Colonial claims that plaintiffs have improperly attempted to convert their motion to dismiss into a motion for summary judgment by submitting affidavits and additional evidence beyond the pleadings. (See Defendant's Memorandum Of Law In (1) Opposition To Plaintiff's Motion To Dismiss The Counterclaim, (2) Opposition To Plaintiffs' Motion For A Permanent Injunction And (3) Support Of Defendant's Cross-Motion To Amend The Counterclaim ("Def. Mem.") at 1-2.) Because Colonial does not identify the affidavits and additional evidence it references and because plaintiffs did not submit any additional filings in connection with this motion other than its moving and reply papers, the Court can only assume that Colonial is referring to the two declarations previously submitted by plaintiffs in support of their motion for a preliminary injunction. When resolving a motion to dismiss for failure to state a claim, the Court may consider the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings. See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 152-153 (2d Cir. 2002). The Court may properly consider the two earlier declarations because it is evident that defendant relied upon them and the Court's treatment of them in Masefield I in formulating its counterclaim. Therefore, their consideration by the Court does not render the instant motion one for summary judgment.

Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995)). Thus, "[t]he issue is not whether [the claimant] will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 128 F.3d 59, 62-63 (2d Cir. 1997). A party's claim should not be dismissed in this instance "unless it appears beyond doubt that the [movant] can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Lipsky v. Commonwealth United Corp., 551 F.2d 887, 894-95 (2d Cir. 1976). However, the claim "must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory." Huntington Dental & Med. Co. v. Minnesota Mining & Mfg. Co., No. 95 Civ. 10959, 1998 WL 60954, at *3 (S.D.N.Y. Feb. 13, 1998).

## II. Colonial's Counterclaim

In its counterclaim, Colonial seeks an order pursuant to 9 U.S.C. § 4 compelling plaintiffs to submit to arbitration pursuant to the Contract, including submission of the claims filed in this action. (See Answer and Counterclaim ("C-Cl.") ¶ 1.)[3] Title 9 U.S.C. § 4 permits a party to an arbitration agreement claiming breach to bring an action in federal court for an order directing that the arbitration proceed in the manner provided for in the agreement. See 9 U.S.C. § 4. Colonial argues that plaintiffs may be compelled to arbitrate because they are bound to the Contract's arbitration provision. (See C-Cl. ¶ 1.) Although plaintiffs are not parties to the Contract, Colonial alleges that "[p]laintiffs exercised complete domination over Masefield

---

[3] In its Answer, Colonial restarts the numbering of paragraphs in the final "Counterclaim" section. Unless otherwise noted, the Court's citations to the Answer are to that section only.

America as regards its entering into, and performance of, the Contract" and "[t]his domination was used to defraud and damage Colonial."[4] (Id. ¶ 28.)

As a preliminary matter, plaintiffs argue that the counterclaim is jurisdictionally deficient because it grounds personal jurisdiction over plaintiffs in the Contract signed only by MA. (See Memorandum In Support Of Motion To Dismiss Counterclaim ("Pls. Mem.") at 3.) Plaintiffs ask the Court to view them as counterclaimants who have not freely submitted to the Court's jurisdiction because they commenced this action defensively in response to Colonial's improper arbitration demand. (Id. at 3 n.1.) The Court rejects this reasoning, as plaintiffs cannot employ the Court's jurisdictional power as both a sword and shield. Plaintiffs seek affirmative relief from this Court in this matter, and therefore have consented to its jurisdiction. See Andros Compania Maritima, S.A. v. Intertanker Ltd., 718 F. Supp. 1215, 1217 (S.D.N.Y. 1989) (Leisure, J.) ("It is a fundamental tenet of jurisdictional law that a party may waive a challenge to the Court's *in personam* jurisdiction, . . . and appearing and seeking affirmative relief from the Court is the paradigm of such a waiver.")[5]

With respect to the merits of the counterclaim, plaintiffs insist that they cannot be compelled to arbitrate because Colonial's allegations mimic the assertions that the Court previously rejected in granting plaintiffs' application for a preliminary injunction. (See Pls. Mem. at 4.) As noted above, in Treppel I, the Court rejected each of the three arguments

---

[4] Notwithstanding this allegation, Colonial states that the evidence supports only a breach of contract claim against plaintiffs, not a fraud claim. (See Def. Mem. at 15-16 n.3.)

[5] The Court notes for the parties' benefit that subject matter jurisdiction here is based upon the diversity of the parties, and not upon 9 U.S.C. § 4. Indeed, the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, does not provide an independent basis for jurisdiction. See Perpetual Secs., Inc. v. Tang, 290 F.3d 132, 136 (2d Cir. 2002); see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 n.32 (1983) ("The [Federal] Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction.").

advanced by Colonial for binding the non-signatory plaintiffs to the Contract: estoppel, agency and alter ego.[6] Colonial resurrects these theories in its opposition to the instant motion, relying now upon the allegations contained within its counterclaim and the affidavits of two employees involved in the negotiation and the performance of the Contract. Building upon its analysis in Treppel I, the Court now turns to defendant's apparently enhanced arguments.

### A. Estoppel

In Masefield I, the Court explained that a non-signatory may be bound to an arbitration agreement only where the non-signatory knowingly exploited and accepted benefits of the agreement. See Masefield I, at *9 (citing MAG Portfolio Consult., GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 61 (2d Cir. 2001)). However, the benefits must flow directly from the agreement and cannot result from events involving the parties that occur independent of the agreement. Id. (citing MAG Portfolio, 268 F.3d at 61 (citing Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir. 1995) (holding that the non-signatory was not subject to arbitration because the competitive advantage gained by the non-signatory flowed from its acquisition of one of the signatories, not directly from the agreement))). Colonial argued that Masefield AG is estopped from avoiding arbitration because it received all of the proceeds from the fuel oil purchased under the Contract as part of MA's repayment of a debt previously owed to Masefield AG.[7] Id. at *11. After noting that the Contract does not mention Masefield AG or its receipt of the proceeds, the Court rejected Colonial's estoppel argument,

---

[6] In its opposition papers, Colonial only expressly relies upon the theories of estoppel and agency. (See Def. Mem. at 12-15.) However, in a footnote, it appears to renew its alter ego argument as well. (Id. at 15 n.3). Therefore, the Court will address all three theories.
[7] Colonial's initial estoppel argument was limited to Masefield AG. It now argues that both plaintiffs should be obligated to arbitrate under an estoppel theory.

finding that the benefit to Masefield AG does not flow directly from the Contract but from Masefield AG's position as MA's lender. Id. at *12-14.

Relying principally upon the affidavit of its Vice President, Steven McNear, Colonial now contends that there are additional material facts demonstrating plaintiffs' intent to benefit directly from the Contract. According to McNear, plaintiffs participated in negotiating and drafting the Contract (see Affidavit of Steven McNear ("McNear Aff.") ¶ 6), and their involvement was so significant that the first draft of the Contract was on Masefield AG letterhead (id. ¶ 8, Ex. A). In addition, "Masefield LTD and/or Masefield AG had specific duties under the contact [sic] – including hedging and supplying the cargos (shipments of oil via tanker) to Colonial Oil on behalf of [MA]." (Id. ¶ 11.) As a result, Colonial considered plaintiffs beneficiaries of the Contract (id. ¶¶ 10, 13), which became more apparent when Masefield Ltd. began to pressure MA to cancel the Contract because it was losing money (id. ¶¶ 20, 22). Colonial argues that these new allegations establish that plaintiffs received direct benefits from the Contract, and therefore, they are estopped from avoiding arbitration.

Even construing Colonial's counterclaim liberally and drawing all reasonable inferences in its favor, the Court is not persuaded that Colonial can prove that plaintiffs benefited directly from the Contract. Participating in the Contract negotiations and assisting in the satisfaction of some of its terms, assertions that plaintiffs do not dispute, does not necessarily render plaintiffs direct beneficiaries. Moreover, the Court does not credit Colonial's allegation that plaintiffs had "specific duties" under the Contract, including hedging and supplying oil shipments to Colonial, because it finds no support for such a claim in the terms of the Contract. The Contract assigns no duties to either Masefield AG or Masefield Ltd., does not address the practice of hedging, and identifies only MA as the supplier of oil. Therefore, there is no basis for Colonial to conclude

that plaintiffs intended to profit from the sale of the cargos sold pursuant to the Contract. (See Def. Mem. at 13-14.) Further, as noted above, Masefield AG is never mentioned in the Contract and Masefield Ltd. is listed only once as the contact party on behalf of MA. Finally, McNear's claim that Colonial understood that plaintiffs intended on benefiting from the Contract is entirely speculative, and does nothing to advance Colonial's position. Thus, Colonial's additional allegations do not persuade the Court to depart from its earlier conclusion that Masefield AG's receipt of the proceeds resulted solely from its position as MA's lender, and thus did not flow directly from the Contract. Because Colonial does not identify any other apparent benefits received by either plaintiff, the Court finds Colonial's estoppel argument unavailing, and plaintiffs cannot be bound to the Contract under this theory.

### B. Agency

Though it previously maintained that plaintiffs should be compelled to arbitrate because they served as MA's agents under the Contract, Colonial now contends the converse, namely that plaintiffs are bound to arbitrate because MA was merely their agent throughout the performance of the Contract. (Id. at 14-15.) As the Court explained in Masfield I, "'[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" Masefield I, at *15-16 (quoting Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 130 (2d Cir. 2003)). Moreover, "'conclusory allegations of a general agency relationship between a signatory and a non-signatory do not suffice to compel . . . unwilling non-signatories to arbitrate under [this] theory.'" Id. at *15 (quoting Alco Int'l, E.C. v. Merrill Lynch & Co., 98 Fed. Appx. 44, 46-47 (2d Cir. 2004) (citation omitted)).

Unfortunately for Colonial, its agency argument is constructed from a collection of conclusory allegations. In its counterclaim, Colonial contends that MA acted under plaintiffs' control when it entered into the Contract, and that plaintiffs consented to MA signing the Contract on their behalf. (See C-Cl. ¶¶ 17, 22, 24.) Further, McNear avers that MA's actions under the Contract had to be approved by one or both plaintiffs. (See McNear Aff. ¶ 16.) In essence, without more specific allegations, Colonial is relegated to arguing that MA should be deemed plaintiffs' agent because all three companies are affiliated. (See Def. Mem. at 15 ("Indeed, there must be at least a reasonable inference that all significant decisions are approved by Mr. Daley, the ultimate owner of the Masefield entities and the individual who participated in the negotiation of the contract.").) This position ignores the Court's admonition in Masefield I, and fails to rehabilitate Colonial's agency argument. See Treppel I, at *15 ("A full showing of agency supported by an accepted theory of agency or contract law is required, and generalized allegations of affiliation are insufficient.") (citing Merrill Lynch, 337 F.3d at 130-31) (citation omitted).) Colonial's assertion that plaintiffs, as the principals, pressured MA to cancel the Contract beginning in May 2004 is not persuasive because MA, the purported agent, did not cancel the Contract until October 2004. In short, plaintiffs' assistance in the negotiation and performance of the Contract does not necessarily render MA their agent because related companies may provide support to one another without establishing an agency relationship. Therefore, plaintiffs cannot be bound to arbitrate on the theory that MA signed the Contract as their agent.

### C.  Alter Ego

Although there is a question as to whether Colonial even intended to renew its alter ego argument, the answer is rendered moot because this third theory suffers from deficiencies similar

to the two before it. If one corporation completely dominated the actions of another corporation with respect to the transaction at issue, and that domination was used to defraud or injure the party seeking relief, the court may find that the dominated corporation was the alter ego of the dominating corporation and hold the dominating corporation liable for the actions of its alter ego. See MAG Portfolio, 268 F.3d at 63; Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997). Thus, in the arbitration context, if the conduct in question reveals "a virtual abandonment of separateness" between the two corporations, a non-signatory may be bound to arbitrate where it exercised complete domination over a signatory and used that domination to injure another signatory to the agreement. See, e.g., Thomson, 64 F. 3d at 777-78 (citations omitted).

As noted in footnote six, supra, Colonial only intimates in its opposition papers that the alter ego theory applies to plaintiffs. However, in the interest of completeness, the Court will address it because the counterclaim contains assertions that support an alter ego argument, including the claim that "Masefield America is a shell company without its own assets and is used by Plaintiffs as their alter ego." (C-Cl. ¶ 11). Recognizing that the Court's inquiry into whether one corporation has completely dominated another is "fact specific," MAG Portfolio, 268 F.3d at 63 (listing ten factors that courts may consider) (citation omitted), Colonial proffers the following additional allegations in support of its theory that MA was merely plaintiffs' alter ego for purposes of the Contract: (1) MA had to obtain the approval of Daley, Masefield AG's President, before signing the Contract (C-Cl. ¶ 24); (2) there is overlap in the ownership of MA and plaintiffs, as well as in the personnel negotiating and performing the Contract (id. ¶ 25); (3) MA was and remains "severely undercapitalized" (id. ¶ 26); and, (4) there has been "rigorous intermingling of funds and properties" between MA and plaintiffs (id. ¶ 27).

11

The first two contentions attempt to demonstrate a fact that has already been established and is not in dispute, namely that MA is affiliated with plaintiffs and relied upon them to some extent in the negotiation and performance of the Contract. However, affiliation does not necessarily lead to domination, and, on the present record, the Court is unwilling to infer that Masefield AG's President or any other personnel working for plaintiffs exerted a commanding influence over MA for the purpose of injuring Colonial. While MA may have received support from plaintiffs in its dealings with Colonial, Colonial's own averments suggest that Colonial primarily dealt with representatives from MA only. (See McNear Aff. ¶¶ 19 (recounting May 2004 meeting between Colonial and Kenneth Scheepers, MA's President, Clyde Meltzer, MA's Vice President, and Luis Gomez, a trader at MA); 21 (recounting September 2004 meeting involving the same individuals); Affidavit of Paul Rosado ¶ 2 (providing that he kept in daily contact with Luis Gomez, his counterpart at MA, throughout the entire period of the Contract).) Moreover, nothing in Colonial's papers shows that MA was so dependent on plaintiffs that it operated without any degree of discretion. On the contrary, one could argue that waiting until October 2004 to cancel the Contract after first receiving pressure from Masefield Ltd. in May 2004 evidences a clear exercise of discretion on the part of MA. Further, the fact that MA needed Daley's approval before executing the Contract hardly proves domination because, though he is Masefield AG's President, he is also the sole owner of MA's parent, Masefield Trading AG. Colonial cannot expect the Court to pierce the corporate veil of a subsidiary because it seeks the consent of the sole owner of its parent.

With respect to the latter two allegations, they are conclusory and unsupported by sufficiently specific charges. Colonial has consistently claimed that MA is an undercapitalized entity, labeling it a "shell company" (C-Cl. ¶ 11) and an "empty bag" (Def. Mem. at 15), but has

failed to offer a more detailed showing to support these characterizations. Even if the Court infers that MA failed to pay its share of the ICC arbitration fee because it was financially unable to do so, it does not follow that MA is inadequately capitalized. In addition, Colonial offers no proof for its claim that plaintiffs and MA have engaged in "rigorous" intermingling of funds and properties. The Court does not see how Masefield AG's hedging of the last two allotments of oil designated for delivery to Colonial amounts to rigorous intermingling of funds or properties. Without further explanation, this allegation, like those before it, does nothing to advance Colonial's alter ego theory.

In short, Colonial's assertions do not reveal the sort of complete domination required to bind plaintiffs to the Contract. Its counterclaim and accompanying affidavits fail to establish "a virtual abandonment of separateness" between and among these three corporations. If Colonial believed, as it claims, that these companies were so inter-related and that it was essentially negotiating with all three of them, it should have insisted that all three be made parties to the Contract, particularly if it had any concerns regarding MA's financial viability. The Court is not now in a position to undo Colonial's decision to execute the Contract with MA only, and permit it to arbitrate with plaintiffs as well. Accordingly, on the present record, the Court finds that MA is not plaintiffs' alter ego, and therefore, plaintiffs are not bound to arbitrate pursuant to the Contract.

### III. Colonial's Request to Amend Its Counterclaim

In its opposition to plaintiffs' motion to dismiss its counterclaim, Colonial also seeks leave to amend the counterclaim in order to assert claims for tortious interference with contract and tortious interference with business relations against plaintiffs. (See Def. Mem. at 16-18.) Plaintiffs argue that, despite the fact that they initiated the present action, they have not

submitted to the general jurisdiction of the Court and should not be forced to litigate claims unrelated to the underlying arbitration demand. (See Reply Memorandum In Support Of Motion To Dismiss Counterclaim And In Opposition To Cross-Motion For Leave To File Amended Counterclaim ("Pls. Rep.") at 16.) The Court addressed and rejected this argument in Discussion Part II, supra. In addition, plaintiffs contend that leave to amend should be denied on futility grounds because Colonial's new counterclaims are deficient as a matter of law. (Id. at 18-19.)

A party to an action may amend its pleadings pursuant to Rule 15 of the Federal Rules of Civil Procedure "by leave of court or by written consent of the adverse party; and [leave] shall be freely given when justice so requires." Fed. R. Civ. P. 15. The Supreme Court has made clear that "this mandate is to be heeded," and that leave to amend should be given in the absence of undue delay, bad faith or dilatory motive, undue prejudice to the opposing party or futility. Foman v. Davis, 371 U.S. 178, 182 (1962). An amendment to a pleading will be deemed futile if the proposed claim could not withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dougherty v. North Hempstead Zoning Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002). "Denials of leave to amend a complaint are reviewed for abuse of discretion." Lowry v. Eastman Kodak Co., No. 00 Civ. 9332, 2001 WL 682447, at *2 (2d Cir. June 13, 2001) (citing Krumme v. Westpoint Stevens Inc., 43 F.3d 71, 88 (2d Cir.1998)).

The liberal standard embodied in Rule 15, coupled with the fact that Colonial's amended claims are not necessarily vulnerable to a motion to dismiss, lead the Court to reject plaintiffs' futility argument. Though the Court need not delve into the merits of Colonial's two new claims here, it is evident, even at this preliminary stage, that Colonial will be able to establish at least some of the elements necessary to plead *prima facie* claims for tortious interference with contract and with business relations. Moreover, the Court is not concerned that Colonial harbors any

dilatory motive as this request is being made at the behest of Colonial's new counsel, who were only recently retained. Accordingly, Colonial is granted leave to amend its counterclaim to include the claims of tortious interference with contract and tortious interference with business relations against plaintiffs.

## IV. Plaintiffs' Request for a Permanent Injunction

In its petition to dismiss Colonial's counterclaims, plaintiffs also ask the Court to convert the preliminary injunction currently in place in this action into a permanent injunction. Plaintiffs, however, do nothing more than recite the request; they do not offer any argument or cite to a single relevant authority. In Masefield I, the Court granted plaintiffs' motion for a preliminary injunction based on plaintiffs' showing that (1) it would suffer irreparable harm if forced to arbitrate with Colonial, and (2) there is a likelihood that plaintiffs will succeed on the merits. See Masefield I, at *22. However, a permanent injunction is not automatically born from a preliminary injunction, as the former requires a greater showing, namely actual success on the merits. See, e.g., Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n.12 (1987); University of Texas v. Camenisch, 451 U.S. 390, 392 (1981). Quite simply, plaintiffs have not explained to the Court how, at this inchoate stage, they have achieved actual success on the merits of their claims. As a result, their request for a permanent injunction is denied.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to dismiss defendant's counterclaim is GRANTED and plaintiffs' motion for a permanent injunction is DENIED. Further, defendant's cross-motion for leave to amend the counterclaim is GRANTED. Colonial is granted leave to amend its counterclaim to include claims of tortious interference with contract and tortious interference with business relations within 21 days of the date of this Opinion and Order. The

15

parties are directed to appear for a pre-trial conference on October 20, 2005 at 11 a.m. in

Courtroom 18B at 500 Pearl Street, New York, New York.

**SO ORDERED.**
**New York, New York**

August **31**, 2005

_____
U.S.D.J.

Copies of this Opinion and Order have been sent to:

Stanley McDermott, III, Esq.
DLA Piper Rudnick Gray Cary US LLP
1251 Avenue of the Americas
New York, New York 10020-1104

Blaine H. Bortnick, Esq.
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, New York 10022