USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2|15|06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MASEFIELD AG and MASEFIELD LTD.,

                Plaintiffs,

- against -

COLONIAL OIL INDUSTRIES,

                Defendant.

**OPINION AND ORDER**

05 Civ. 2231 (PKL)

**APPEARANCES**

STANLEY MCDERMOTT, III, ESQ.
ROBERT F. FINK, ESQ.
DLA Piper Rudnick Gray Cary US LLP
1251 Avenue of the Americas
New York, New York 10020-1104

Attorneys for Plaintiffs


BLAINE H. BORTNICK, ESQ.
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, New York 10022

Attorneys for Defendant

**LEISURE, District Judge:**

Plaintiffs Masefield AG ("AG") and Masefield Ltd. ("LTD") move to dismiss defendant Colonial Oil Industries, Inc.'s ("Colonial") amended counterclaim. The instant action was set in motion by Colonial's decision to name plaintiffs in a demand for arbitration (the "Arbitration Demand") filed with the International Chamber of Commerce ("ICC"). Plaintiffs filed the action because they seek to avoid arbitration before the ICC, requesting injunctive relief enjoining Colonial from attempting to arbitrate with them and a declaratory judgment providing that they have no agreement to arbitrate with Colonial and are not bound to arbitrate with Colonial. On April 18, 2005, the Court granted plaintiffs' request for a preliminary injunction, finding that, on the record before the Court, plaintiffs, as non-signatories, cannot be bound to the arbitration agreement between Colonial and non-party Masefield America ("MA"), pursuant to the theories of estoppel, agency, or alter ego. Accordingly, the Court enjoined Colonial from asserting to the ICC Tribunal (the "Tribunal") in the arbitration proceeding against MA that the Tribunal has the power to determine whether plaintiffs must arbitrate Colonial's demands. One week later, on April 25, 2005, the Court denied Colonial's motion to dismiss for failure to state a claim because it was based on the same arguments that the Court considered and rejected in granting plaintiffs' application for a preliminary injunction.

On May 9, 2005, Colonial filed an answer and counterclaim, wherein it asked the Court to dismiss the Complaint with prejudice and direct plaintiffs to submit to arbitration, including submission of plaintiffs' claims brought in this action. Plaintiffs moved to dismiss the counterclaim for failure to state a claim, and to enjoin Colonial

2

permanently from seeking to arbitrate its claims against them. In its opposition, Colonial cross-moved for leave to amend its counterclaim in order to assert claims of tortious interference with contract and tortious interference with prospective business relations against both plaintiffs. On August 31, 2005, the Court (1) dismissed defendant's counterclaim; (2) denied plaintiffs' request to convert the preliminary injunction currently in place into a permanent injunction; and (3) granted defendant's cross motion to amend its counterclaim. Colonial thereafter filed its amended counterclaim, and plaintiffs subsequently moved to dismiss for failure to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, plaintiffs' motion is GRANTED.

## BACKGROUND

The facts giving rise to this action are set forth in the Court's prior decisions, with which familiarity is assumed. See Masefield AG v. Colonial Oil Indus., Inc., No. 05 Civ. 2231, 2005 WL 2105542 (S.D.N.Y. Aug. 31, 2005) ("Masefield II"); Masefield AG v. Colonial Oil Indus., Inc., No. 05 Civ. 2231, 2005 WL 957344 (S.D.N.Y. Apr. 25, 2005); Masefield AG v. Colonial Oil Indus., Inc., No. 05 Civ. 2231, 2005 WL 911770 (S.D.N.Y. Apr. 18, 2005) ("Masefield I"). In September 2003, MA, a non-party affiliate of plaintiffs, agreed to sell approximately 50,000 tons of fuel oil to defendant Colonial, a large oil distributor, each month for the one-year period beginning November 1, 2003. The purchase agreement (the "Contract") contained an arbitration provision, which provided for all disputes between the parties to be resolved under the rules of the ICC by a three-member arbitration panel appointed by the parties. In October 2004, Colonial filed a demand for arbitration with the ICC, alleging that MA and plaintiffs defaulted on

the Contract by failing to deliver fuel oil during the final two months of the Contract period. In several submissions to the ICC, plaintiffs maintained that they were not subject to ICC jurisdiction because they were not parties to the Contract or any other arbitration agreement with Colonial. Nonetheless, the ICC decided to refer the threshold issue of arbitrability to the Tribunal. As a result, plaintiffs filed the instant action on February 17, 2005, seeking injunctive and declaratory relief.

The Masefield group of companies are closely affiliated and directed by James Daley, who is President of AG and also Managing Director of LTD. Specifically, Mr. Daley owns 90% of AG, which is the parent company of LTD. In addition, Daley is the sole owner of Masefield Trading AG, which is the parent company of MA. (Am. Countercl. ¶ 6.)

Throughout this action, Colonial consistently has maintained that plaintiffs effectively controlled the actions of MA.[1] Colonial resumes that line of argument in its amended counterclaim, wherein it alleges that plaintiffs "exercised complete domination over Masefield American as regards its entering into, and performance of, the Contract." (Am. Countercl. ¶ 22.) According to Colonial, although plaintiffs were not parties to the Contract, they were deeply involved in its negotiation, drafting, and performance. (Am. Countercl. ¶ 8.) In particular, the Contract was dependent upon plaintiffs performing

---

[1] On April 18, 2005, the Court rejected defendant's arguments for binding plaintiffs as non-signatories to the arbitration agreement pursuant to the theories of estoppel, agency, and alter ego. See Masefield, 2005 WL 911770, at *18-19. One week later, on April 25, 2005, the Court denied Colonial's motion to dismiss for failure to state a claim because it was based on the same arguments. See Masefield, 2005 WL 957344, at *2. On August 31, 2005, the Court again rejected these theories, which Colonial had renewed in its opposition to plaintiffs' motion to dismiss Colonial's counterclaim and to enjoin Colonial permanently from seeking to arbitrate its claims against them. See Masefield, 2005 WL 2105542, at *3-6.

4

such functions as confirming price periods and supplying cargos to Colonial, while Colonial was to direct all operational inquiries to LTD. (Am. Countercl. ¶ 8.) Colonial alleges that AG was the beneficiary of all of the letters of credit under the Contract, that Colonial was to make all payments under the Contract to AG, and that the majority of MA's actions under the Contract were required to be cleared by LTD and/or AG. (Am. Countercl. ¶ 8.) Colonial also claims, among other things, that MA was "severely undercapitalized" throughout the relevant time, and that because MA did not have its own physical operations staff at the time the Contract was negotiated, the parties agreed that LTD was to provide staffing to MA. (Am. Countercl. ¶¶ 8-9, 23.)

Ultimately, Colonial alleges, MA breached the Contract by failing to deliver the final two consignments of fuel oil due in September and October 2004. (Am. Countercl. ¶ 22.) For its first cause of action, tortious interference with contract, Colonial claims that plaintiffs "intentionally induced" MA not to deliver the final two consignments by, pressuring and/or directing MA to breach the Contract. (Am. Countercl. ¶ 29.) For Colonial's second cause of action, tortious interference with prospective business relations, Colonial claims that the Contract with which plaintiffs intentionally interfered constituted "business relations." (Am. Countercl. ¶¶ 31-32.) Colonial specifically references an alleged May 2004 meeting between Steven McNear, the Vice President of Colonial; Paul Rosado, a trader at Colonial; Kenny Scheepers, the General Manager of MA; Clyde Meltzer, the Vice President of MA; and Luis Gomez, a trader at MA. (Am. Countercl. ¶ 20.) Colonial alleges that during this meeting, Mr. Scheepers stated that LTD was pressuring MA either to raise the price of the cargo under the Contract or cancel the Contract "because it was losing money." (Am. Countercl. ¶ 20.) At another

5

meeting on or around September 22, 2004, according to Colonial, Mr. Scheepers reiterated that LTD was putting pressure on MA "to get out of the Contract with Colonial because it was losing money." (Am. Countercl. ¶ 21.)

## DISCUSSION

I.   The Court's Jurisdiction

At the outset, the Court will address plaintiffs' argument that Colonial's amended counterclaim should be dismissed because the Court does not have jurisdiction over the parties. In Masefield II, plaintiffs made this same argument with respect to Colonial's initial counterclaim, requesting that the Court view plaintiffs as counterclaimants who had not freely submitted to the Court's jurisdiction because they commenced this action defensively in response to Colonial's arbitration demand. The Court rejected this reasoning in Masefield II, see Masefield AG v. Colonial Oil Indus., Inc., No. 05 Civ. 2231, 2005 WL 2105542, *3 (S.D.N.Y. Aug. 31, 2005), and it rejects it again here. Plaintiffs argue that Colonial's amended counterclaim asserts causes of action unrelated to the arbitration dispute at the heart of this litigation, and that plaintiffs therefore "did not invite [these] claims when [they] commenced the action to stop the ICC arbitration against them." (Pl.'s Mot. Dismiss 8-9). However, it remains true, as it was true in Masefield II, that by commencing this action seeking affirmative relief, plaintiffs have consented to the jurisdiction of this Court. See Andros Compania Maritima, S.A. v. Intertanker Ltd., 718 F. Supp. 1215, 1217 (S.D.N.Y. 1989) (Leisure, J.) ("It is a fundamental tenet of jurisdictional law that a party may waive a challenge to the Court's *in personam* jurisdiction, . . . and appearing and seeking affirmative relief from the Court is the paradigm of such a waiver.").

II.     Rule 12(b)(6) Standard

When determining whether to dismiss a claim on motion for failure to state a claim for which relief may be granted, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (quoting Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000)); see also Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 740 (1976); Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992), cert. denied, 507 U.S. 961, and 507 U.S. 972 (1993). Similarly, when considering a motion to dismiss a counterclaim for failure to state a claim, the Court must accept the material facts alleged in defendant's answer and counterclaim as true and construe all reasonable inferences in favor of defendant. See Twinlab Corp. v. Signature Media Servs., No. 99 Civ. 169, 1999 WL 1115237, at *1 (S.D.N.Y. Dec 07, 1999) (citing, *inter alia*, Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995)). Thus, "[t]he issue is not whether [the claimant] will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 128 F.3d 59, 62-63 (2d Cir. 1997). A party's claim should not be dismissed in this instance "unless it appears beyond doubt that the [movant] can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Lipsky v. Commonwealth United Corp., 551 F.2d 887, 894-95 (2d Cir. 1976). However, the claim "must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory." Huntington Dental & Med. Co. v. Minnesota Mining & Mfg. Co.,

7

No. 95 Civ. 10959, 1998 WL 60954, at *3 (S.D.N.Y. Feb. 13, 1998). Lastly, although the Court must accept as true the factual allegations set out in a complaint or counterclaim, a complaint or counterclaim "which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." DeJesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir.), cert. denied, 519 U.S. 1007 (1996) (internal quotation marks omitted).

III.     Tortious Interference with Contract

Under New York law, a complainant must establish four elements to recover for tortious interference with contract: "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." Albert v. Loksen, 239 F.3d 256, 274 (2d Cir. 2001) (citing Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996)). The Court noted in Masefield II that "it is evident, even at this preliminary stage, that Colonial will be able to establish at least some of the elements necessary" to plead a *prima facie* claim for tortious interference with contract. Masefield AG v. Colonial Oil Indus., Inc., No. 05 Civ. 2231, 2005 WL 2105542, *7 (S.D.N.Y. Aug. 31, 2005). No party disputes that the Contract between Colonial and MA was a valid contract. Colonial has alleged with detail that AG and LTD had knowledge of the Contract. Colonial also has alleged that it suffered damages as a result of the breach. Therefore, whether Colonial properly has stated a cause of action for tortious interference with contract hinges on whether it has alleged that AG and LTD improperly and intentionally interfered with the performance of the Contract.

8

As an initial matter, Colonial's claim against AG fails because Colonial has alleged no specific action on the part of AG to cause MA to breach the Contract. It is true that paragraph 29 of the amended counterclaim alleges that "Masefield Ltd and Masefield AG intentionally induced Masefield America to breach the Contract by, among other things, putting pressure on Masefield American to breach the contract and/or directing it to breach." (Am. Countercl. ¶ 29.) Paragraph 29 also alleges that "[i]n doing so, Masefield Ltd and Masefield AG acted with dishonesty and unfair means." (Am. Countercl. ¶ 29.) However, these conclusory allegations with respect to AG lack any factual underpinnings in the amended counterclaim. While the Court "must accept as true all of the factual allegations set out" in Colonial's complaint, Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (quoting Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000)), it is also true that "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." DeJesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir.), cert. denied, 519 U.S. 1007 (1996) (internal quotation marks omitted); see also Antonios A. Alevizopoulos & Assocs. v. Comcast Int'l Holdings, 100 F. Supp. 2d 178, 186 (S.D.N.Y. 2000) (noting that "pleadings may not be conclusory as the law requires some factual specificity in pleading tortious interference"); World Wide Commc'ns, Inc. v. Rozar, No. 96 Civ. 1056, 1997 WL 795750, at *6-7 (S.D.N.Y. Dec. 30, 1997). Therefore, Colonial's claim for tortious interference with contract is dismissed with respect to AG.[2]

---

[2] The Court notes that even if the Court were to accept these conclusory allegations concerning AG, Colonial's claim against AG for tortious interference with contract would fail for the same reasons its claim against LTD fails.

Unlike with AG, Colonial has alleged specific actions on the part of LTD to interfere with the Contract. Specifically, it has alleged in paragraphs 20 and 21 that LTD "pressured" MA to cancel the Contract. (Am. Countercl. ¶¶ 20-21.) The crucial inquiry, then, is whether this alleged "interference was 'without reasonable justification' or, put differently, was 'improper.'" Jews for Jesus, Inc. v. Jewish Comty. Relations Council of New York, Inc., 968 F.2d 286, 292 (2d Cir. 1992) (quoting Guard-Life Corp. v. S. Parker Hardware Mfg., 406 N.E.2d 445, 448 (N.Y. 1980)). Although there is no bright-line rule by which courts identify "improper" conduct, see id. (citing for consideration several factors set out in section 767 of the Second Restatement of Torts, including the nature of the conduct of the interferer, the interest of the party being interfered with, and the relationship between the parties), the New York Court of Appeals recently has made clear that a defendant's conduct generally need not be illegal or fraudulent to be considered "improper." See Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103 (N.Y. 2004) ("Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." (quoting Guard-Life, 664 N.E.2d at 496)). When a defendant has an economic interest in the contract, however, a plaintiff must prove more than the basic elements listed above. Rather, under New York law, courts will impose liability only where a plaintiff can show that the interference was either malicious or involved conduct rising to the level of criminality or fraud. See Imtrac Indus. v. Glassexport Co., No. 90 Civ. 6058, 1996 WL 39294, at *7-8 (S.D.N.Y. Feb. 1, 1996) (stating that "one with a financial interest in the business that is subject to the contract is privileged to interfere with the

contract in order to protect that self-interest" and granting summary judgment because plaintiff "[had] presented no evidence of malice or illegality") (citing Am. Protein Corp. v. AB Volvo, 844 F.2d 5, 63 (2d Cir.), cert. denied, 488 U.S. 852 (1988); Inn Chu Trading Co. Ltd. v. Sara Lee Corp., 810 F. Supp. 501, 505 (S.D.N.Y. 1992)); Foster v. Churchill, 665 N.E.2d 153, 157 (N.Y. 1996) ("The imposition of liability [for tortious interference with contract] in spite of a defense of economic interest requires a showing of either malice on the one hand, or fraudulent or illegal means on the other." (citing Felsen v. Sol Café Mfg. Corp., 249 N.E.2d 459, 461 (N.Y. 1969)); cf. MDC Corp. v. John H. Harland Co., 228 F. Supp. 2d 387, 397-98 (S.D.N.Y. 2002) (denying motion to dismiss where plaintiff properly pleaded that defendant with an economic interest in subsidiary's contract with plaintiff acted maliciously and used fraudulent or illegal means); Inn Chu Trading, 810 F. Supp. at 506 (denying defendant's motion to dismiss despite defendant's assertion of self-interest privilege where plaintiff properly alleged that defendant had wrongfully induced third-party licensee to provide confidential sales information later used to discontinue the license agreement between a subsidiary of defendant and the plaintiff).

There can be no doubt that LTD had an economic interest in the Contract at the center of this litigation. Indeed, Colonial takes great care in its amended counterclaim to assert that it was this economic interest that motivated plaintiffs to pressure and/or direct MA to breach the Contract. It alleges that LTD pressured MA to "either raise the price of the cargos under the Contract or cancel the Contract because it was losing money." (Am. Countercl. ¶ 20.) It further alleges that because of MA's breach, along with "the increase in the price of oil making the last two cargos more valuable, all of the Masefield entities,

including Masefield Ltd. and Masefield AG, profited substantially." (Am. Countercl. ¶ 22.)

Because plaintiffs had an economic interest in interfering with the Contract, Colonial must plead that the alleged interference was motivated by malice or involved criminal or fraudulent conduct. Colonial clearly has failed to plead malice on plaintiffs' part. On the contrary, the amended counterclaim only alleges that plaintiffs were motivated by a desire for economic profit. (Am. Countercl. ¶¶ 20-21.) Colonial also has not pleaded that plaintiffs engaged in any sort of criminal conduct.

The question remains, then, whether Colonial has pleaded that LTD engaged in fraudulent conduct in connection with its interference with the Contract. Colonial has alleged that, in intentionally inducing MA to breach the Contract, "Masefield Ltd. and Masefield AG acted with dishonesty and unfair means." (Am. Countercl. ¶ 29.) As noted above, even while the Court must accept as true the factual allegations set forth in the Amended Counterclaim, Colonial must do more than make "conclusory allegations unsupported by factual assertions." DeJesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir.), cert. denied, 519 U.S. 1007 (1996) (internal quotation marks omitted). Colonial has provided no factual assertions to support its conclusory allegation that LTD "acted with dishonesty and unfair means" when it interfered with the Contract. It has not alleged that LTD made any false statements or representations to Colonial.[3] Paragraphs

---

[3] Colonial has alleged that LTD was identified in the Contract and that it assumed various duties in connection with the Contract's performance (Am. Countercl. ¶¶ 8, 10); that LTD "was hedging on behalf of" MA during the duration of the contract in order to "protect[] the company against financial loss by counterbalancing the transaction against another" (Am. Countercl. ¶ 15.); that "there has been rigorous intermingling of funds and properties between the various entities in the Masefield group of companies" (Am. Countercl. ¶ 24); and that MA was undercapitalized throughout the relevant time and that

12

20 and 21 of the amended counterclaim contain the entirety of Colonial's allegations regarding the conduct by which LTD interfered with the Contract. In paragraph 20, Colonial alleges that "Masefield Ltd. was pressuring Masefield America to either raise the price of the cargos under the Contract or cancel the Contract because it was losing money." (Am. Countercl. ¶ 20.) In paragraph 21, Colonial alleges that "Masefield Ltd. was putting pressure on Masefield America to get out of the Contract with Colonial because it was losing money." (Am. Countercl. ¶ 21.) Neither of these allegations that LTD applied "pressure" on Masefield America supports an inference that LTD's conduct was fraudulent, and Colonial's conclusory allegation that plaintiffs "acted with dishonesty and unfair means" therefore fails to meet even the liberal standard of Rule 12(b)(6). Consequently, because Colonial has failed to plead either malice or criminal or fraudulent conduct, the Court must dismiss its tortious interference with contract claim against LTD.

Colonial argues that the economic-interest defense has been overruled by Hannex Corporation v. GMI, Inc., 140 F.3d 194 (2d Cir. 1996), in which the Second Circuit revisited language it had used eight years earlier in PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc., 818 F.2d 266 (2d Cir. 1987). In Hannex, the Court wrote: "In PPX, we noted in dicta that under New York Law '[i]f the defendant's interference is intended, at

---

plaintiffs "exercised complete domination" over MA with regard to its entering into and performance of the Contract (Am. Countercl. ¶¶ 23, 25). These allegations appear to be another attempt by Colonial to revive its thrice-rejected argument that MA was a shell corporation used by plaintiffs as their alter ego for the purposes of defrauding Colonial. See Masefield AG v. Colonial Oil Indus., Inc., No. 05 Civ. 2231, 2005 WL 911770, at *18-19 (S.D.N.Y. Apr. 18, 2005); Masefield AG v. Colonial Oil Indus., Inc., No. 05 Civ. 2231, 2005 WL 957344, at *2 (S.D.N.Y. Apr. 25, 2005); Masefield AG v. Colonial Oil Indus., Inc., No. 05 Civ. 2231, 2005 WL 2105542, at *3-6 (S.D.N.Y. Aug. 31, 2005). Standing alone, however, these allegations cannot support an inference that LTD interfered with the Contract by means of fraudulent conduct.

13

least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct.'" Hannex, 140 F.3d at 206 (quoting PPX, 818 F.2d at 269). The Court then observed in a footnote that "[t]his language, limiting wrongful means to the categories of 'criminal or fraudulent conduct,' would appear unduly narrow, inasmuch as the New York Court of Appeals subsequently reiterated the Guard-Life standard (which encompasses a considerably wider range of conduct) in NBT Bancorp." Id.

Contrary to Colonial's assertion, Hannex did not overrule the economic interest defense. To begin with, Hannex involved a claim for tortious interference with prospective economic advantage, rather than tortious interference with contract.[4] To prevail on a claim for tortious interference with prospective economic advantage, a plaintiff must show, *inter alia*, that the defendant interfered either (1) *solely* out of malice or (2) by wrongful means. See Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003); Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994). A defendant whose interference was intended, at least in part, to advance its own interest cannot be said to have acted solely out of malice. In such cases, therefore, a plaintiff must show that a defendant acted by wrongful means. Rather than overruling the economic interest defense, Hannex merely addressed the scope of "wrongful means" in the context of a claim for tortious interference with prospective economic advantage in light of the then-recent decision by the New York Court of Appeals in NBT Bancorp Inc. v. Fleet/Norstar Financial Group,

---

[4] Colonial also cites Scutti Enterprises, LLC v. Park Place Entertainment Corp., 322 F.3d 211 (2d Cir. 2003), for the proposition that the economic-interest defense has been overruled. Like Hannex, Scutti involved a claim for tortious interference with prospective economic advantage, rather than tortious interference with contractual relations, and therefore is inapposite.

14

Inc., in which the New York Court of Appeals endorsed a definition of "wrongful means" that included "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure," but did not include "persuasion alone although it is knowingly directed at interference with the contract." 664 N.E.2d 492, 497 (N.Y. 1996) (quoting Guard-Life Corp. v. Parker Hardware Mfg. Corp., 406 N.E.2d 445 (N.Y. 1980)) (internal quotation marks omitted). Accordingly, after Hannex, courts in this jurisdiction have continued to recognize the defense of economic self-interest in an action for tortious interference with contract. See Night Hawk Ltd. v. Briarpatch Ltd., L.P., No. 03 Civ. 1382, 2003 WL 23018833, at *6 (S.D.N.Y. Dec. 23, 2003) (stating that "economic interest is a defense to an action for tortious interference with a contract unless there is a showing of malice or illegality" (quoting Foster v. Churchill, 665 N.E.2d 153, 156 (N.Y. 1996) (internal quotation marks omitted)); MDC Corp. v. John H. Harland Co., 228 F. Supp. 2d 387, 397-98 (S.D.N.Y. 2002).

Colonial also attempts to argue that those cases in which courts in this jurisdiction have applied the economic interest defense have been limited to instances where the interfering party is within the same ownership chain with the party with whom the complainant has the contract, such as a parent-subsidiary relationship. (See Def.'s Mem. Opp'n Pl.'s Mot. Dismiss 9-10.) Although many of the cases involving the economic interest defense in the context of a tortious interference with contract claim have involved parent-subsidiary relationships, the Court is aware of no authority suggesting that the defense should be limited to that circumstance.[5] Nor can the Court conceive of a

---

[5] The Court calls to Colonial's attention Night Hawk Ltd. v. Briarpatch Ltd., L.P., No. 03 Civ. 1382, 2003 WL 23018833, at *6-7 (S.D.N.Y. Dec. 23, 2003), in which the court denied a plaintiff's motion for summary judgment on a tortious interference with

15

justification for recognizing the defense in the parent-subsidiary context but refusing to recognize it in a case involving such tightly interrelated affiliates as the Masefield companies.

IV.     Tortious Interference with Prospective Business Relations

Colonial's claim for tortious interference with prospective business relations fails for similar reasons. To establish a claim for tortious interference with prospective business advantage, a complainant must prove that: (1) there was a business relationship with a third party; (2) defendant "knew of that relationship and intentionally interfered with it"; (3) defendant either acted "solely out of malice" or used wrongful means; and (4) defendant's "interference caused injury to the relationship" with the third party. See Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003); see also Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 214 (2d Cir. 2002); Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994). This cause of action has a "limited scope." Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 168 (S.D.N.Y. 1998). Because "greater protection is accorded an interest in an existing contract . . . than to the less substantive, more speculative interest in a prospective relationship," courts require "proof of more culpable conduct on the part of the interferer" to impose liability on defendants who interfere with prospective business relationships than they require to impose liability on

---

contract claim where the defendants had acted to protect their economic interest in certain film projects by putting third parties, with whom plaintiff had entered a film licensing agreement, on notice of their adjudicated rights and interests in the projects. The relationship between the defendants and the third parties in Night Hawk was that of competitors, not of a parent corporation and a subsidiary. Id. at *1-3. Courts also have recognized the defense of economic interest in cases where the relationship between the defendant and the third party was that of a shareholder to a corporation, see Imtrac Indus., Inc. v. Glassexport Co. Ltd., No. 90 Civ. 6058, 1996 WL 39294, at *1-2 (S.D.N.Y. Feb. 1, 1996), and board directors to a corporation, see Foster v. Churchill, 665 N.E.2d 153, 154 (N.Y. 1996).

16

defendants who interfere with existing contracts. NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, 664 N.E.2d 492, 497 (N.Y. 1996) (quoting Guard-Life Corp. v. Parker Hardware Mfg. Corp., 406 N.E.2d 445 (N.Y. 1980)) (internal quotation marks omitted)

Therefore, "as a general rule, the defendant's conduct must amount to a crime or an independent tort" because "[c]onduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other non-binding economic relations." Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103 (N.Y. 2004); see also Treppel v. Biovail Corp., No. 03 Civ. 3002, 2005 WL 427538, at *7 (S.D.N.Y. Feb. 22, 2005) (Leisure, J.) (noting that the general rule following Carvel is that defendant's conduct must amount to a crime or an independent tort); Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc., 349 F. Supp. 2d 389, 423 (N.D.N.Y. 2004) (same). The only recognized exception to the rule applies where a defendant engages in conduct "for the sole purpose of inflicting intentional harm on plaintiffs." Carvel, 818 N.E.2d at 1103 (quotation omitted).

As with its tortious interference with contract claim, Colonial has not alleged any interference on the part of AG apart from the conclusory allegation that "Masefield Ltd and Masefield AG intentionally interfered with [Colonial and MA's] business relations by using dishonest, unfair and improper means," (Am. Countercl. ¶ 32). This conclusory language is without factual underpinnings in the Amended Counterclaim. For that reason, Colonial's claim for tortious interference with business relations against AG is dismissed.

With respect to LTD, the question before the Court is whether the alleged acts supporting Colonial's claim for tortious interference with business relations, if accepted

17

as true at this preliminary stage, constitute a crime, an independent tort, or were motivated solely by malice. The answer to this question is no. As noted above, Colonial has not alleged malice on the part of LTD; rather, it has alleged that LTD was motivated by a desire for profit. Nor has Colonial, by claiming that LTD pressured MA to "either raise the price of the cargos under the Contract or cancel the Contract because it was losing money," alleged that LTD engaged in conduct amounting to a crime or an independent tort. (Am. Countercl. ¶ 20.)

Although a defendant's conduct generally must be criminal or tortious to qualify as "wrongful means," the New York Court of Appeals has held that "[w]rongful means" also may include "some degrees of economic pressure." Carvel, 818 N.E.2d at 1104 (quotations and citations omitted). For economic pressure to be wrongful it must be "extreme and unfair." Id. at 1105; see also Treppel v. Biovail Corp., No. 03 Civ. 3002, 2005 WL 427538, at *9 (S.D.N.Y. Feb. 22, 2005) (Leisure, J.). It is not clear what "extreme and unfair" means, and whether economic pressure can be "extreme and unfair" without being tortious and criminal. Regardless, Colonial has made no allegation from which it could be inferred that the "pressure" it claims LTD applied on MA was "extreme and unfair."

Finally, although the New York Court of Appeals has acknowledged that the malice exception may not be the only exception to the general rule requiring a crime or independent tort, it has expressly declined to recognize any other exception because only "egregious conduct" would justify an additional exception. Carvel, 818 N.E.2d at 1103-04. Here, Colonial has not directed the Court to any conduct that is sufficiently egregious to justify another exception to the general rule.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to dismiss Colonial's Amended Counterclaim is GRANTED. Colonial has TWENTY DAYS from the date of this Opinion and Order to seek leave to replead. The parties are ORDERED to appear before this Court at 500 Pearl Street, Courtroom 18B for a status conference on March 23, 2006 at 10:00 a.m. unless a motion is pending.

**SO ORDERED.**
**New York, New York**

February 14, 2006

_____
U.S.D.J.

Copies of this Opinion and Order have been sent to:

Stanley McDermott, III, Esq.
DLA Piper Rudnick Gray Cary US LLP
1251 Avenue of the Americas
New York, New York 10020-1104

Blaine H. Bortnick, Esq.
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, New York 10022